**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
*Ft. Lauderdale Division*

FILED BY _____ D.C.

MAR 2 4 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

UNITED STATES OF AMERICA

-and-

THE STATE OF FLORIDA, *ex rel.*
[UNDER SEAL]

      *Plaintiffs,*

v.

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

      *Defendants.*

Case No. 16cv80459-KAM

**Complaint for Violations of the
Federal False Claims Act, 31
U.S.C. § 3729 et seq. and the
Florida False Claims Act, Fla.
Stat. § 68.081 et seq.**

**FILED UNDER SEAL**

**Jury Trial Demanded**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

THE STATE OF FLORIDA

EX REL. SHARON MAHAFFEY

      6535 52nd Ave.
      Vero Beach, Florida 32967

AND

EX REL. MARK BRIMER

      850 Loggerhead Island Drive
      Satellite Beach, Florida 32937

      *Plaintiff*s,

v.

CARTER HEALTHCARE

      1401 S. E. Goldtree Drive, Suite 101
      Port St. Lucie, Florida 34952

STANLEY CARTER

      1401 S. E. Goldtree Drive, Suite 101
      Port St. Lucie, Florida 34952

BRAD CARTER

      1401 S. E. Goldtree Drive, Suite 101
      Port St. Lucie, Florida 34952

**Case No. _____**

**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729 et seq. and the Florida False Claims Act, Fla. Stat. § 68.081 et seq.**

**FILED UNDER SEAL**

**Jury Trial Demanded**

*Serve:*

ALLIED HEALTH CARE CORP.

  2700 West Cypress Creek Road
  Suite B-100
  Fort Lauderdale, Florida 33309

  *Defendants.*

## INTRODUCTION

1.      Qui tam Relators Sharon Mahaffey and Mark Brimer (collectively "Relators"), by their attorneys, individually and on behalf of the United States of America and the State of Florida, file this complaint against Defendant Carter Healthcare ("Defendant") to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act, 31 U.S.C. § 3729 et seq. and the Florida False Claims Act, Fla. Stat. § 68.081 et seq.

2.      Carter Healthcare is owned by Stanley Carter

3.      Brad Carter is the Chief Compliance officer at Carter Healthcare and is in charge of Carter Healthcare's Florida operations.

4.      Mahaffey was an occupational therapist for Carter Healthcare and was employed by Carter Healthcare from October 2014 to February 2016.

5.      Brimer is a physical therapist for Carter Healthcare; he was hired by Carter Healthcare in September 2014.

6.      Brimer is still employed at Carter Healthcare.

7.      Carter Healthcare is defrauding the government by billing Medicare, TriCare, and Medicaid for unnecessary medical services. Carter Healthcare does this in three primary ways:

a. First, Carter Healthcare mandates 18 visits per patient per certification period (60 days) without regard to medical necessity or, in many cases, even performing an initial exam on a patient. Carter Healthcare has identified 18 visits as a number low enough to avoid detection and an audit by the government.

b. Second, Carter Healthcare automatically recertifies patients that have no medical need for continued therapy.

c. Third, Carter Healthcare refuses to discharge patients who have no measured benefit from therapy.

d. Fourth, Carter Healthcare issues homebound therapy services to patients who are ineligible for homebound healthcare services.

8. Carter Healthcare continues to perpetuate the fraud directly against the Centers for Medicare & Medicaid Services ("CMS").

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

10. Mahaffey's federal cause of action for unlawful retaliation is authorized by 31 U.S.C. § 3730(h).

11. This Court has personal jurisdiction over the corporate Defendant pursuant to 31 U.S.C. § 3732(a) because the corporate defendant, Carter Healthcare conducts business within this judicial district.

12. This Court has personal jurisdiction over defendant Brad Carter because he resides in and regularly conducts business within this juridical district.

13.     The Court has personal jurisdiction over defendant Stanley Carter because Stanley Carter regularly conducts business within this judicial district.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a) because the complained of illegal acts giving rise to this action occurred within this judicial district and because Carter Healthcare is headquartered in this judicial district.

## THE PARTIES

15.     Relator Mahaffey is a citizen of the United States and a resident of Vero Beach, Florida.

16.     Relator Brimer is a citizen of the United States and a resident of Satellite Beach, Florida.

17.     Relators Mahaffey and Brimer are the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and state that their knowledge of the information contained herein has not been publically disclosed.

18.     Mahaffey began working at Carter Healthcare in October 2014.

19.     Brimer began working at Carter Healthcare in September 2014.

20.     Mahaffey worked out of Carter Healthcare's Melbourne and Vero Beach Florida offices until Carter Healthcare terminated her employment in February 2016.

21.     Brimer continues to work out of Carter Healthcare's Melbourne, Florida office.

22.     Carter Healthcare is in the business of providing home healthcare to homebound patients, including physical therapy and occupational therapy, as well as pharmacy services and other tangential medical services.

23.     Carter Healthcare employs approximately 750 home health professionals.

24.     Among other locations, Carter Health operates facilities at:

    a.  2700 W. Cypress Creek Road, Suite B-100, Fort Lauderdale, Florida 33309

    b.  1901 S. Congress Ave., #330, Boynton Beach, Florida 33426

    c.  1499 W. Palmetto Park Road, Suite 416, Boca Raton, Florida 33486

    d.  93 Royal Palm Pointe, Vero Beach, Florida 32960.

25.     Defendant Carter Healthcare's registered agent is Allied Health Care Corp, 2700 West Cypress Creek Road, Suite B-100, Fort Lauderdale, Florida 33309.

26.     Carter Healthcare services a substantial number of Medicare, Medicaid, and TriCare beneficiaries.

27.     While each state Medicaid program is run by the individual state, the federal government does provide federal funds to each state Medicaid program. As such, federal dollars are implicated in each claim reimbursed by a state Medicaid program.

## BACKGROUND

### I.    Medicare Requirements

24.     In 1965, Congress enacted Title XVIII of the Social Security Act under 42 U.S.C. §1395, *et seq.* ("The Medicare Program" or "Medicare") authorizing the federal government to pay for the cost of certain medical services for persons aged 65 and older.

25.     The United States, through the Department of Health and Human Services ("HHS"), administers the Medicare program.  Part B of the Medicare Program is a federally subsidized health insurance system for disabled persons, blind persons, or persons who are 65 or older.  Eligible persons aged 65 and older may enroll in Part B of the Medicare Program to

obtain benefits in return for payments of monthly premiums as established by HHS. Part B covers, in general, 80% of reasonably charged services and items other than hospital expenses, and 100% of clinical diagnostic services.

26.     HHS has delegated the administration of the Medicare Part B Program to its component agency, the Health Care Financing Administration ("HCFA").

27.     Medicare reimbursement to providers of medical services is accomplished through private insurance carriers ("carriers"), as provided by 42 U.S.C. § 1395u. The carrier, on behalf of the Medicare Program, reviews and approves claims submitted for reimbursements by Medicare providers.

28.     The carrier makes payment on those claims which appear to be eligible for reimbursement under Medicare Part B on behalf of the United States. 42 U.S.C. § 1395u(a). Claims may be made by the beneficiaries or by providers who have received assignment from beneficiaries to make claims on their behalf. *See* 42 U.S.C. §§1395u(b)(3)(B). HHS, through HCFA, has issued the HCFA Carriers Manual ("Manual"), which is a guideline and explanation of the Medicare statute and its regulations.

29.     Before accepting Medicare assignments, Carter Healthcare, and all providers who submit claims for services provided to Medicare beneficiaries, must certify that it will operate in accordance with the requirements established by the Secretary of the Department of Health and Human Services.

30.     At all times herein mentioned, Carter Healthcare had knowledge of the public policies expressed in the laws and regulations herein mentioned and of the fact that it must comply with all applicable Federal laws in order for the services Carter Healthcare performs to be approved for coverage under Medicare.

31.     The Centers for Medicare and Medicaid Services ("CMS") is the organization that administers and manages Medicare.

32.     The State of Florida administers Medicare services through many facilities, including Carter Healthcare.

33.     TriCare is a federal health care program for the U.S. Department of Defense's Military Health System.

34.     Medicare guidelines for Home Healthcare services – like PT, OT, skilled nursing – require that the patient be "homebound." *See* 42 C.F.R. § 484.55(a)(1).

35.     "Homebound" is defined by Medicare as follows: (1) the patient is not recommended to leave his or her home due to his or her condition; (2) the patient's condition keeps him or her from leaving home without help (such as a wheelchair or walker, special transportation, or assistance from another person); (3) leaving home takes a considerable and taxing effort for the patient. *See* 42 U.S.C. § 1395n(a).

36.     Medicare is willing to pay for home healthcare services if a patient is homebound because providing services in a patient's home is the most efficient way to treat a homebound individual.

37.     Medicare coverage of home healthcare services hinges on medical necessity, as prescribed by a doctor or other qualified healthcare professional.

38.     Physical therapy is defined by CMS as services that treat an injury or disease by mechanical means. This includes heat therapy, light therapy, exercise, and massage therapy.

39.     Occupational therapy is defined by CMS as services that help patient return to normal life activities directly following an illness or medical trauma. Normal activities may include bathing, preparing meals, housekeeping, and other parts of a daily routine.

40.     In order for a healthcare provider to bill CMS for physical or occupational therapy services, those services must be "medically necessary" insofar as they are health-care services or supplies needed to prevent, diagnose, or treat an illness, injury, condition, disease, or its symptoms and that meet accepted standards of medicine.

## II.     Carter Healthcare

41.     Carter Healthcare was founded in 1989 by Stanley Carter.

42.     Carter Healthcare has offices operating in Florida, Ohio, Pennsylvania, Texas, and Oklahoma.

43.     Carter Healthcare provides services for home health, hospice, pharmacy, and durable medical equipment.

44.     Carter Healthcare employs upwards of 750 health professionals, including, but not limited to, registered nurses, licensed practical nurses, physical therapists, occupational therapists, speech language pathologists, home health aides, hospice professionals, and medical social workers.

45.     Many of Carter Healthcare's patients have physical and occupational therapy needs.

46.     Carter Healthcare maintains approximately 1,000 home health care patients in Florida.

47.     Brad Carter oversees all of Carter Healthcare's Florida operations.

48.     Preya Bhavsar is the Associate Director of Operations at Carter Healthcare. She is responsible for hiring, firing, awarding bonuses, and tracking certification and recertification rosters.

49.     Charlotte Nelson, RN is the clinical coordinator in Carter Healthcare's Melbourne office. Nelson is the branch manager in Melbourne office and oversees all nurses in the office.

50.     Nelson is responsible for assigning patients to therapists, including Mahaffey and Brimer.

51.     Heather Pepper, RN is the clinical coordinator in Carter Healthcare's Vero Beach office. Pepper is also responsible for assigning patients to therapists, including Mahaffey.

52.     Diane Emerson is the clinical educator at Carter Healthcare's headquarters in Oklahoma.

53.     Lisa Schoepp is a scheduler in Carter Healthcare's Fort Lauderdale's office. Schoepp is responsible for all scheduling in south Florida.

54.     When Carter Healthcare contracts with a new patient, Schoepp makes the determination as to which office in Florida that patient should be assigned and offers a recommendation to the office's clinical coordinator as to which therapist should be tasked with treating the patient.

55.     LeRae Scroggins is the rehabilitation manager at Carter Healthcare's headquarters in Oklahoma.

56.     Dr. Venu Kumar "Vinny" Luthra refers patients to Carter Healthcare. Relator believes that Luthra is compensated for his services.

**III.    Relators Sharon Mahaffey and Mark Brimer**

57.     Mahaffey earned a Bachelor's of Science in Occupational Therapy from the University of Wisconsin in 1987.

58.     Mahaffey possesses over 30 years of experience as an occupational therapist.

59.     Mahaffey is a licensed occupational therapist. Her license number (issued by the Department of Health, Division of Medical Quality Assurance in the State of Florida) is OT 11195.

60.     Carter Healthcare terminated Mahaffey in February 2016.

61.     Carter Healthcare hired Mahaffey in October 2014 as an occupational therapist.

62.     Brimer is a licensed physical therapist.  His license number (issued by the Department of Health, Division of Medical Quality Assurance in the state of Florida) is 2876.

63.     Brimer is a licensed Healthcare Risk Manager ("LHRM") by the state of Florida.

64.     Brimer earned a Bachelor's of Science in Physical Therapy from Florida International University in 1980.

65.     Brimer earned a Masters of Business Administration from Florida Institute of Technology in 1983.

66.     Brimer earned a Doctorate of Philosophy in Computer Technologies from Nova Southeastern University in 1993.

67.     Brimer possesses over 36 years of experience as a physical therapist

68.     Carter Healthcare hired Brimer in September 2014.

69.     Brimer is still employed by Carter Healthcare.

70.     Brimer and Mahaffey were often paired together to treat patients, with Brimer handling the physical therapy needs and Mahaffey responsible for the occupational therapy needs of Carter patients.

## FACTUAL ALLEGATIONS

### IV.    Defendants Falsify OASIS Reports

71.     Outcome and Assessment Information Set ("OASIS") reports are the initial comprehensive assessments for patients receiving skilled care to be reimbursed by Medicare. They supply data to CMS for the purpose of measuring the quality of care that is provided by the certified home health agencies.

72.     OASIS reports are mandated by Section 1895 (b)(3)(B)(v)(II) of the Social Security Act. "Each home health agency shall submit to the Secretary such data that the Secretary determines are appropriate for the measurement of health care quality. Such data shall be submitted in a form and manner, and at a time, specified by the Secretary for purposes of this clause."

73.     OASIS reports are also mandated in the Medicare regulations at 42 C.F.R. § 484.250(a). This requires home healthcare agencies to submit OASIS assessments and data in order to stay in compliance with the quality reporting requirements of the Social Security Act.

74.      42 C.F.R. § 484.225(i) provides that home healthcare agencies that meet the quality data reporting requirements are eligible to receive the full home health market basket percentage increase. Home healthcare agencies that do not meet the reporting requirements are subject to a two percent reduction in the home health market basket increase.

75.     OASIS reports are meant to measure quality of care and serve to determine provider compliance with the home health quality reporting program requirements.

76.     Carter Healthcare instructs nurses to falsify OASIS reports by scoring patients as having very low capabilities in the initial OASIS report.

77.     Carter Healthcare does this so patients can be discharged at a much higher functioning level, showing more improvement than was actually made.  This gives the false impression that services provided by Carter Healthcare are overwhelmingly successful and necessary.

78.     Carter Healthcare trains nurses to alter the OASIS reports as part of their orientation training in Oklahoma.

79.     Physical and occupational therapy cannot be performed until a nurse certifies through the OASIS report that the patient requires therapy.

80.     The nurses certify home healthcare and therapy is necessary when they send the OASIS reports to CMS.

81.     For example, Schoepp scheduled Nelson to evaluate Patient A.S. in January 2016.

82.     Following the submission of Patient A.S.'s OASIS report, Nelson assigned the patient to Brimer for physical therapy.

83.     Brimer determined Patient A.S. required only one additional physical therapy visit (as was recommended by her physician).  When he protested, Nelson responded by insisting that he provide therapy services.

From: Charlotte Nelson
Sent: Thursday, January 14, 2016 5:37 PM
To: Mark Brimer
Cc: Preya Bhavsar; Lisa Schoepp; Stephanie Durbin
Subject: ▮▮▮▮▮▮▮▮▮▮

Mark,

This patient is not in a facility, she lives at home with her family. Patient does need PT she has declined significantly since last cert period and according to MD. This is your case communication:

[cid:image005.png@01D14FB3.4311B7F0]

Charlotte Nelson, RN
Clinical Coordinator | Carter Healthcare
640 Classic Court, Suite 102 | Melbourne, FL 32940
O: 321-242-8228 | F: 321-242-8401

84.     Nelson stepped in to reassign the patient to another physical therapist.

From: Charlotte Nelson
Sent: Thursday, January 14, 2016 5:43 PM
To: Mark Brimer
Cc: Preya Bhavsar; Lisa Schoepp; Stephanie Durbin
Subject: RE: ▮▮▮▮▮▮▮▮▮▮

Lisa,

I need this patient to go to Kyle's schedule please. Patient will need to be evaluated.

Charlotte Nelson, RN
Clinical Coordinator | Carter Healthcare
640 Classic Court, Suite 102 | Melbourne, FL 32940
O: 321-242-8228 | F: 321-242-8401

From: Lisa Schoepp
Sent: Friday, January 15, 2016 7:11 AM
To: Charlotte Nelson; Mark Brimer
Cc: Preya Bhavsar; Stephanie Durbin
Subject: RE: ████████████
I thought you are putting in a new PT eval ? Mark has a visit for 1/20 and I guess
that is his DC visit Please let me know ty

Lisa Schoepp
Therapy Scheduler | Carter Healthcare
2700 W. Cypress Creek Road, Suite B.100 | Fort Lauderdale, FL 33309
O: 954-971-0500 | F: 954-978-6863

85.     Patient A.S. remained on Carter Healthcare's service for another certification

period.

86.     Nelson told Brimer that she had physicians' orders that would keep Patient A.S.

on service. This was not true. Nelson never received updated orders from a physician.

87.     The high rate of in home therapy can be directly attributed to the reports written

by the nurses.

**V.      Defendants Provide Therapy Services Without Regard to Medical Necessity**

88.     CMS monitors the manner in which home health agencies provide services to

patients.

89.     In order to do so, CMS utilizes data points, such as number of visits provided to

patients by home healthcare agencies.

90.     Carter Healthcare learned from its operation in Oklahoma that 20 or more home

visits for a patient in a single 60 day certification period is likely to trigger heightened scrutiny or

an investigation from Medicare.

91.     As such, Carter Healthcare schedules and bills CMS for 18 visits per certification period, regardless of necessity.  Numerous e-mails from the company illustrate this point:

a. On September 23, 2015, Scroggins sent an e-mail referencing the 18 visit policy and states that, "combined therapies cannot exceed 18 visits per certification period without prior authorization from the Director of Rehabilitation."

---

From: Charlotte Nelson
Sent: Wednesday, October 21, 2015 4:25 PM
To: Richard King; Hany Wahba; Mark Brimer; Patrick Marshall; Kelly Bordas; Nicole Grogan; Bryce Rittgers
Cc: Cassandra Holten
Subject: FW: Therapy order frequency

PLEASE READ BELOW



Charlotte Nelson, RN
Clinical Coordinator | Carter Healthcare
640 Classic Court | Melbourne, FL 32940
O: 321-242-8228 | F: 321-242-8401

From: LeRae Scroggins
Sent: Wednesday, September 23, 2015 3:57 PM
To: Therapy
Cc: Brad Carter; Clinical Coordinators; Therapy Scheduling; Diana Emerson
Subject: Therapy order frequency

Therapists,

As we grow as an home health organization, at times it is good to restate that your professional expertise is extremely valuable to meeting Carter Healthcare's mission and vision. With that being said, Carter Healthcare depends on your expertise to determine the frequency of the visits needed for the best possible outcomes for the patient. We have used the example of 2wk9 as the easiest way to remain at 18 visits for the certification period but this is only an example and should not be taken as the only option for frequency of visits.

Please feel free to craft the frequency of your visits to reflect specific physician orders, or to maximize the benefit to the patient, whether that includes front end loading or decreasing the frequency at the end of the certification period . The only stipulation is that combined therapies can not exceed 18 visits per certification period without prior authorization from the Director of Rehabilitation. The patient's evaluation and all visit notes will be reviewed for medical necessity and documentation that will support the need for additional visits.

If you have any questions or concerns, please feel free to contact me. Thanks for all you do for our patients daily!

LeRae Scroggins, PT, MBA
Director of Rehabilitation | Carter Healthcare
3105 S. Meridian Avenue | Oklahoma City, OK 73119
O: 405-947-7705 ext 246 | F: 888-622-4329

---

b. On April 11, 2015, Schoepp e-mailed Mahaffey stating that Carter needed to provide "18 total" therapy sessions.  Again, this determination was made without regard to medical necessity.





92.     In order to avoid scrutiny from Medicare, Carter Healthcare automatically

schedules all or nearly all patients for 18 visits (9 occupational therapy visits, 9 physical therapy

visits.  In the event that a physical or occupational therapy is unjustifiable, a nurse will add in speech therapy to meet the 18 visit requirement and to maximize billing to Medicare.



From: Lisa Schoepp
Sent: Thursday, January 14, 2016 7:39 AM
To: Jason Torres (jasontorres10@hotmail.com); Mark Brimer
Cc: Charlotte Nelson; Kari Futch
Subject: OT,PT eval

Please discuss freq 18 phone # s on referral thanks

Lisa Schoepp
Therapy Scheduler | Carter Healthcare
2700 W. Cypress Creek Road, Suite B.100 | Fort Lauderdale, FL 33309
O: 954-971-0500 | F: 954-978-6863

93.     The 18 visits are often scheduled prior to any consultation with nurses or the therapists.

94.     If therapists protest the unnecessary visits, Carter Healthcare's nurses (including Nelson and Pepper) and managers (including Bhavsar) overrule the therapist.

95.     For example, Patient S.J. is 92 years old. He has a damaged rotator cuff (a severe shoulder injury), but doctors are unwilling to pursue surgery due to his advanced age.

96.     Nelson assigned Brimer to treat Patient S.J. in January 2016.

97.     Nelson assigned Mahaffey to treat Patient S.J. in January 2016.

98.     Patient S.J. is not homebound despite Carter Healthcare designating him for homebound care.

99.     Patient S.J. drove to breakfast every day.

100.    On several occasions, Brimer observed Patient S.J. pulling into his driveway just as Brimer was arriving.

101.    Without suffering substantial injuries, Patient S.J. was involved in a minor car accident during the time he was receiving treatment from Brimer and Mahaffey.

102.    Brimer provided eight, or about eight, physical therapy sessions to Patient S.J.

103.    Mahaffey visited Patient S.J. three times. Each visit was between 35-55 minutes long.

104.    Patient S.J. also has dementia and therefore cannot remember anything from his sessions with Mahaffey.

105.    Mahaffey determined that Patient S.J. was incapable of benefiting from occupational therapy.

106.    On February 10, 2016, Mahaffey recommended that Patient S.J. be discharged because therapy provided him no benefits. Patient S.J. was noncompliant with safety instruction, refused to use his cane or walker, and his dementia meant he lacked insight into his deficits. The rotator cuff issue in patient S.J.'s left shoulder was not improving and would not be improved by continued therapy.

107.    Carter Healthcare management rejected Mahaffey's attempts to discharge Patient S.J.

108.    Following Mahaffey's recommendation to discharge Patient SJ, Nelson emailed Mahaffey "we do not need to be discharging this patient from any therapy."



109.    Mahaffey reiterated several reasons for terminating therapy, including the fact that the therapy was not improving the patients shoulder injury.



110.    Nelson subsequently argued that it was Carter Healthcare's job to "provide teaching, reinforce teaching, and again reinforce teaching," despite Mahaffey's repeated statement that dementia prevented Patient S.J. from retaining any of the teachings.

111.    Mahaffey wrote, "At this stage of dementia, new learning becomes extremely difficult if not impossible. After he completes the 18 therapy visits as prescribed, if he is still noncompliant or unable to follow through with safety techniques it will be apparent that he is not benefitting from my services. If he is not benefitting it would be unethical and fraudulent for me to continue."



112.    Bhavsar, Nelson, Brimer, and Mahaffey were included in all communication regarding Patient S.J. on February 10, 2016.

113.    On February 10, 2016, Bhavsar, Associate Director of Operations, told Mahaffey that "There is no way we are discharging him!"



114.    Nelson agreed with Bhavsar.

From: Charlotte Nelson
Sent: Wednesday, February 10, 2016 8:30 AM
To: Preya Bhavsar; Mark Brimer; Sharon Mahaffey
Cc: LeRae Scroggins
Subject: RE: █████████████████

I agree, Mark just did an incident report on his fall from 2/3/2016

Charlotte Nelson, RN
Clinical Coordinator | Carter Healthcare
640 Classic Court, Suite 102 | Melbourne, FL 32940
O: 321-242-8228 | F: 321-242-8401

115.    Following Mahaffey's termination, Brimer continued to see patient S.J.

116.    Brimer never discharged Patent S.J., but he stopped seeing Patient S.J. after the

eight visits.

117.    Carter Healthcare is attempting to retain Patient S.J. on its physical therapy services; however, Patient S.J. refuses to see any physical therapists other than Brimer.

118.    Brimer refuses to resume treatment of Patient S.J. because there is no medical necessity for physical therapy to be provided.

119.    Patient S.J. was not the only patient who suffered dementia that Carter Healthcare unnecessarily kept on service.  On several occasions, Nelson instructed Mahaffey and Brimer to go to the dementia lock down units of various mental wards to treat patients suffering from severe dementia.  Given their mental state, these patients received no benefit from Carter Healthcare's therapy services.

120.    Relators Mahaffey and Brimer estimate that at least one third of the approximately 18,000 patient visits per 60 day certification period are medically unnecessary.

**VI.     Defendants Force Healthcare on Patients, Even Over their Objections**

121.    Carter Healthcare also continues with the full 18 visits regardless of what the patient desires and over the objections of family members.

122.    Carter Healthcare instructs their therapists to go to patient homes, even if they have been rejected at the door, to persuade (or, if necessary, force) patients to continue therapy.

123.    For example, Patient W.S. is an elderly patient. He suffers from recurrent urinary tract infections.

124.    Nelson assigned Mahaffey to treat Patient W.S. in May 2015.

125.    Due to the infections that made Patient W.S. delirious, he was unable to retain the benefits of therapy. Additionally, it was extremely painful for Patient W.S. to endure therapy sessions.

126.    In June 2015, after two visits, Patient W.S.'s wife requested that Mahaffey discontinue therapy.

127.    On June 9, 2015, after Patient W.S. had already refused treatment on four separate occasions, Nelson acknowledged that the patient was "too confused from the infections to retain therapy," yet required Mahaffey to "be consistent and continue to call and try to get in."



128.    Mahaffey continued to go to Patient W.S.'s house at the scheduled times, only to be turned away by his wife.

129.    At the end of the certification period, Nelson removed Patient W.S. from Mahaffey's caseload.

130.  Despite the fact that Patient W.S. refused treatment on what ultimately came to be seven occasions, Carter Healthcare still billed CMS for Mahaffey's "visits" to Patient W.S.'s home.

131.  Patient W.S. refused no benefit from these visits, because Mahaffey never provided any services to him.  Yet, Carter Healthcare billed CMS for these visits anyway.

132.  Carter Healthcare assigned Brimer to Patient M.T.

133.  Patient M.T. asked to discontinue therapy for the month of December 2015 after undergoing several months of therapy.

134.  Patients who ask to abstain from treatment for an entire month are generally not in need of additional therapy.

135.  Patient M.T. was not in need of therapy.

136.  Therefore, Brimer attempted to discharge Patient M.T.

137.  Nelson sent Stephanie Cult, a nurse and clinical coordinator based in the Melbourne office, to talk Patient M.T. into more therapy.

138.  Patient M.T. called Carter Healthcare and threated to turn the company in for fraud if Brimer returned to her house.

139.  Only this threat from Patient M.T. was enough to force Carter Healthcare to discontinue therapy services.

140.  Carter Healthcare subsequently learned that Patient M.T. had fallen again in her home.

141.  Patient M.T. was placed back on Carter Healthcare physical therapy service with a physical therapist other than Brimer.

VII.    **Carter Healthcare Compels Therapists to Perform Homebound Home Healthcare Services for Ineligible Patients**

142.    Carter Healthcare assigned Brimer to treat Patient S.J. In February 2016.

143.    Patient S.J. is not homebound despite Carter Healthcare designating him for homebound care.

144.    Patient S.J. drove to breakfast every day.

145.    On several occasions, Brimer observed Patient S.J. pulling into his driveway just as Brimer was arriving.

146.    Without suffering substantial injuries, Patient S.J. was involved in a minor car accident during the time he was receiving treatment from Brimer and Mahaffey.

147.    Brimer provided approximately eight physical therapy sessions to Patient S.J.

148.    Brimer never discharged Patent S.J., but he stopped seeing Patient S.J. after the eight visits, because Patient S.J. could no longer benefit from home care physical therapy services.

149.    Carter Healthcare assigned Brimer to treat Patient F.D. in February 2016.

150.    Patient F.D. had the singular goal of regaining the ability to play golf.

151.    Patient F.D.'s physician had instructed him to become more integrated into the community and to begin doing tai chi.

152.    Patient F.D.'s daughter could not drive him to tai chi, so Patient F.D. was enrolled in Carter Healthcare's services.

153.    Brimer explained to Carter Healthcare that "there is no reason why he can't play golf," indicating that Patient F.D. was not homebound. As such, Brimer's official notes reflect that Patient F.D. is independent with ambulation.

154.    Patient F.D. is ambulatory; he walks without any assistance.

155.    Patient F.D. was not in need of home healthcare services.

156.    Patient F.D. should have never been certified for home healthcare.

157.    Patient F.D. was only on Carter Healthcare service for one certification period.

158.    Brimer only saw him seven times, and not the required 18 visits.

159.    Brimer insisted on discharging Patient F.D., because he clearly did not need the services and because Patient F.D.'s family refused to allow nursing services to come to Patient F.D.'s home.

160.    None of Brimer's seven visits to Patient F.D. were medically necessary and should not have been performed because Patient F.D. was ineligible for homebound therapy.

161.    Patient F.D. is a prime example of a patient who should have outpatient physical therapy services instead of homebound services.

162.    For another example, Nelson assigned Patient H.W. to Brimer in early 2015.

163.    Nelson designated Patient H.W. as homebound and declared him a fall risk.

164.    After several months of physical therapy, Patient H.W. instructed Brimer not to come for their next several appointments as Patient H.W. was taking a vacation to the Philippines.

165.    Patients who are able to travel out of town or take extensive trips are not qualified to be considered "homebound" by Medicare.

166.    Brimer discharged the patient from his service on July 8, 2015 when Patient H.W. left for the Philippines.

167.    Upon Patient H.W.'s return from the Philippines, Nelson visited the patient on August 3, 2015 and assigned him to another physical therapist, Hany Wahba.

From: Charlotte Nelson
Sent: Tuesday, August 11, 2015 10:52 AM
To: Lisa Schoepp
Cc: Stephanie Durbin; Cassandra Holten
Subject: █████████

Lisa,

Please move the PT evaluation from Mark to Hany on ████████ please. I
have talked to both Mark any Hany and Hany has had █████████ before and her
is comfortable about getting in to see the patient.

Charlotte Nelson, RN
Clinical Coordinator | Carter Healthcare
640 Classic Court | Melbourne, FL 32940
O: 321-242-8228 | F: 321-242-8401

---

From: Charlotte Nelson
Sent: Tuesday, August 11, 2015 10:12 AM
To: Lisa Schoepp; Hany Wahba; Mark Brimer
Cc: Stephanie Durbin; Cassandra Holten
Subject: RE: █████████

Hany,

█████████ in on your schedule and just transfer and you will see it there.

Thank you,

Charlotte Nelson, RN
Clinical Coordinator | Carter Healthcare
640 Classic Court | Melbourne, FL 32940
O: 321-242-8228 | F: 321-242-8401

168.    Wahba began seeing Patient H.W. on August 12, 2015.

169.    Wahba determined that Patient H.W. was not in need of any physical therapy.

170.    Due to his service being full, Wahba asked Brimer to take over services to Patient

H.W.

171.   Brimer refused to resume physical therapy sessions with Patient H.W.

172.   Carter Healthcare, through Schoepp (the south Florida scheduler), attempted to push Patient H.W. back to Brimer.

---

From: Lisa Schoepp
Sent: Friday, September 18, 2015 6:55 AM
To: Mark Brimer; Hany Wahba
Cc: Kylie Jones; Heidi McDonald; Charlotte Nelson
Subject: RE: Take over this pt ▮▮▮▮▮▮▮▮▮

Please speak to Hany as he has a VERY heavy case load as of now it is on your sch . Please let me know thanks

Lisa Schoepp
Therapy Scheduler | Carter Healthcare
2700 W. Cypress Creek Road, Suite B.100 | Fort Lauderdale, FL 33309
O: 954-971-0500 | F: 954-978-6863


-----Original Message-----
From: Mark Brimer
Sent: Thursday, September 17, 2015 5:27 PM
To: Lisa Schoepp; Hany Wahba
Cc: Kylie Jones; Heidi McDonald; Charlotte Nelson
Subject: RE: Take over this pt ▮▮▮▮▮▮▮▮

If it would be possible - could we hold off until the following week? I am out part of next week and it is pretty busy......

From: Lisa Schoepp
Sent: Thursday, September 17, 2015 1:30 PM
To: Mark Brimer; Hany Wahba
Cc: Kylie Jones; Heidi McDonald; Charlotte Nelson
Subject: Take over this pt ▮▮▮▮▮▮▮▮

Hany said he spoke to you as of next week this pt has been placed on your sch
ty

Lisa Schoepp
Therapy Scheduler | Carter Healthcare
2700 W. Cypress Creek Road, Suite B.100 | Fort Lauderdale, FL 33309
O: 954-971-0500 | F: 954-978-6863

---

173.   Wahba subsequently discharged Patient H.W.

174.    Wahba has numerous patients on his service for more than a year.

175.    Wahba treats approximately 63 patients per week.

**VIII.   Defendants Recertify Patients Regardless of Need**

176.    Recertification is the process of reevaluating a patient and determining that there

is still a medical necessity for continued treatment. This evaluation is required every 60 days. In

order to recertify a patient, their physician, nurse practitioner, or physician assistant must review

the patient's plant of treatment, as well as the therapist's notes on the patients' progress to

determine the patients' medical needs. If the appropriate medical official determines that the

patient is in need of continued care, they may recertify the treatment plan by signing the medical

record.

177.    Carter Healthcare instructs its employees to "be creative" when finding reasons to

recertify patients.

178.    Carter Healthcare encourages therapists and nurses to recertify patients regardless

of medical necessity.

179.    Carter Healthcare has an internal goal to treat all patients for at least six months

and a preference to retain patients for at least a year, regardless of need.

180.    For example, Bhavsar sent an email on June 25, 2015, instructing Emerson,

Educational Coordinator, to train Mahaffey on "how she can keep patients on for multiple

[recertifications]."



181.    Bhavsar sent this June 25, 2015, e-mail after Mahaffey objected to recertifying a patient due to lack of medical necessity. Bhavsar took Mahaffey aside and told her to "be creative, think outside the box and find a way to recertify and keep these patients on for multiple recertifications," or words to that effect.

182.    In response to Mahaffey's request to discharge Patient R.D., Nelson instructed Mahaffey to "go to the patient's house and hold her hand," or words to that effect.



183.    On October 27, 2015, Mahaffey again wrote to Schoepp, Nelson, and Bhavsar,

informing them that Patient R.D. no longer needed therapy services.

-----Original Message-----
From: Sharon Mahaffey
Sent: Tuesday, October 27, 2015 5:20 PM
To: Lisa Schoepp; Charlotte Nelson; Mark Brimer; Preya Bhavsar
Subject: RE: PT,OT on new cert 10/29 ███████████

This patient has been discharged from OT services and is at her max potential. I saw her for three certs.
She doesn't need anymore OT at this time. I reported this at case conference. I spoke with her daughter
and she has agreed to PT services only at this time ._____
From: Lisa Schoepp
Sent: Tuesday, October 27, 2015 1:40 PM
To: Mark Brimer; Sharon Mahaffey
Cc: Charlotte Nelson; Stephanie Culp
Subject: PT,OT on new cert 10/29 ██████████

On sch for Thursday please discuss freq ty

Lisa Schoepp
Therapy Scheduler | Carter Healthcare
2700 W. Cypress Creek Road, Suite B.100 | Fort Lauderdale, FL 33309
O: 954-971-0500 | F: 954-978-6863

184.    Nelson pushed back, stating that the patient did require additional therapy despite

the fact that Patient R.D. had already been seen for three certification periods and despite

Mahaffey's insistence that Patient R.D. was at her "max potential."

From: Charlotte Nelson
Sent: Wednesday, October 28, 2015 8:22 AM
To: Lisa Schoepp; Sharon Mahaffey
Cc: Preya Bhavsar; Stephanie Durbin; Stephanie Culp
Subject: RE: PT,OT on new cert 10/29 ███████████

Lisa and Sharon,

I realize Sharon you may have seen her for the max three certification periods but her issues have not been resolved. The patient just went yesterday for another chest x ray for possible Pneumonia, is unable to use her upper body to get out of her scooter report to the RN by patient's daughter, and patient also had +3 pitting edema with wheeping pores. And patient remains a huge fall risk due to being Hypotensive. These are reasons why the RN has placed both therapies back in the home. Please feel free to contact me of the RN if you need more clarification or Stephanie.

Thank you,


Charlotte Nelson, RN
Clinical Coordinator | Carter Healthcare
640 Classic Court | Melbourne, FL 32940
O: 321-242-8228 | F: 321-242-8401

185.    Mahaffey again refused to re-certify Patient R.D.

From: Sharon Mahaffey
Sent: Friday, October 30, 2015 11:04 AM
To: Charlotte Nelson
Cc: Preya Bhavsar; Stephanie Durbin; Stephanie Culp
Subject: RE: PT,OT on new cert 10/29 ███████████

 Since I have not heard back from anyone regarding an alternate OT to see ███████████ I will discharge the OT orders at the end of the day to clear her off my schedule. Again this patient has achieved max benefit from three cert period with OT.Based on my clinical judgement this patient will not benefit from continued OT at this time and for me to continue to provide OT services would be a violation of _the American Occupational Therapy Association Code of ethics and medicare law.

186.    On numerous occasions, Brimer received instructions to recertify patients that no longer needed therapy.

187.     Brimer rarely discharges a patient without seeing the patient for at least four months.

188.     There are a few patients that have been on Brimer's service for over a year.

189.     Carter Healthcare employees are reprimanded if their patient counts fall.

190.     Bhavsar reprimanded Mahaffey on several occasions after her roster of patients decreased.

**IX.     Defendants Falsify Documentation to Justify Therapy Services**

191.     Before submitting documentation to CMS, Carter Healthcare instructs therapists to alter their chart notes in order to falsely justify therapy services.

192.     On August 6, 2015, Audra Baber of Carter Healthcare's Quality Assurance Department wrote an e-mail instructing therapists to change their notes to justify a decision not to discharge Patient M.N.

From: Audra Baber
Sent: Thursday, August 06, 2015 12:55 PM
To: Charlotte Nelson
Cc: Stephanie Durbin; Preya Bhavsar; LeRae Scroggins; Diana Emerson; Francis Scully
Subject: ████████████R

After reviewing the chart on the patient ████████ for the cert period 5/7/2015-7/5/2015, there were several items of concern noted. Please follow up with the appropriate clinician and have him/her complete annotations. I have included an attachment on how to complete annotations, if needed.

• H&P submitted as the face to face lacks sufficient information to support homebound. A separate email request was sent to the PSCs to obtain an actual face to face.

• SN visit from 6/1/2015: teaching and interventions directed towards diagnosis of CHF. However, our focus for the cert period was pneumonia.

• Physical therapy: All notes appear to be copied and pasted with only minor variations in documentation (see attachment). Each note on the subjective documentation, including the discharge visit, says "Patient admitted into homecare services today." Additionally, what assistance/teaching was provide, did the patient require verbal cues, tactile cues, etc.

• PT discharged on 6/3/2015 and OT discharged on 6/4/2015, both with goals met. Then, SN did not see the patient for almost 4 weeks which shows a large gap in care. In between therapy discharging and the SN visit on 7/2/2015, the patient fell resulting in a left leg fracture. On 7/2/2015, the patient requested discharge. (We cannot change this situation, but I did want to point this out).

Please obtain documentation and have annotations completed by 8/13/2015 and upload to the ADR Portal. If you have questions about any of the above, please contact me at ext 202 in the QA department.

Thank you for your assistance,

Audra Baber, RN
Quality Assurance | Carter Healthcare
3105 S. Meridian Avenue | Oklahoma City, OK 73119
O: 405-947-7700 | F: 888-622-4329

193.   On August 3, 2015, Emerson instructed Brimer to omit information that would not

support a medical necessity determination in favor of treatment.

From: Diana Emerson
Sent: Monday, August 03, 2015 4:31 PM
To: Mark Brimer
Cc: Charlotte Nelson
Subject: RE: Homebound

Perfection sir!
Thanks for your quick response!

Diana Emerson, PTA
Therapy Educator | Carter Healthcare
3105 S. Meridian Ave | Oklahoma City, OK 73119
O: 405-947-7705 x199 | F: 888-622-4329

-----Original Message-----
From: Mark Brimer
Sent: Monday, August 03, 2015 4:30 PM
To: Diana Emerson
Cc: Charlotte Nelson
Subject: RE: Homebound

Done!!

From: Diana Emerson
Sent: Monday, August 03, 2015 4:20 PM
To: Mark Brimer
Cc: Charlotte Nelson
Subject: RE: Homebound

Please annotate this note to clarify that a family member provides transportation for this patient due to....(what is the reason for the patient's inability to leave the home safely.) Going forward, if it is not significant information to support the medical necessity of the patient, please omit that information from your SOAP note.

The fact that the patient is planning on going to the pool, minimizes the Homebound Criteria of poor endurance.
Thank you Mark. Please feel free to contact me with any concerns or questions.

Diana Emerson, PTA
Therapy Educator | Carter Healthcare
3105 S. Meridian Ave | Oklahoma City, OK 73119
O: 405-947-7705 x199 | F: 888-622-4329

194.    This occurred even after Patient M.N. made it clear to both Mahaffey and Brimer that she no longer desired their services.

## X.    Carter Healthcare Focuses on Recertification in Order to Raise Census Numbers

195.    In a staff meeting attend by Bhavsar, Nelson, Brimer, Mahaffey, and other therapists, Nelson delivered a message from Brad Carter, mandating re-certifications in order to keep the census numbers up.

196.     During staff meetings (otherwise known as case conference meetings), Bhavsar issued statements to the effect of "that's what we like to hear" when a therapist recommended recertification of a patient.

197.     Conversely, when a therapist stated there was nothing more to be done for the patient, Bhavsar interrogated the therapist as to the reasons why he or she did not wish to recertify.

198.     In mid-2014, the previous Associate Director, Shawna Hyde, left Carter Healthcare.

199.     Hyde disagreed with the recertification policy at Carter Healthcare.

200.     Hyde had stated something to the effect of, "I can understand two certification periods, but after that you have to wonder why the patient is still in homecare."

201.     At the time of Hyde's departure, the Melbourne office maintained a census of approximately 110 patients.

202.     Bhavsar replaced Hyde in mid-2014.

203.     After Bhavsar and Nelson joined Carter Healthcare in mid-2014, the census numbers jumped to approximately 130 patients within only a few months.

204.     Around this time, Carter Healthcare stopped discharging patients all together.

205.     The census drive mandate came directly from Brad Carter who sent numerous e-mails to the staff, urging them to continue to recertify patients so that the Florida offices could meet a pre-determined goal of 957 patients, without regard to whether those 957 patients actually needed therapy services.

From: Brad Carter
Sent: Wednesday, September 09, 2015 7:51 AM
To: Katherine Rogers; Fort Lauderdale; Boca Raton; Boynton Beach; Jupiter; Jensen Beach; Port St. Lucie; Vero Beach; Melbourne; Tampa; Largo; New Port Richey
Subject: RE: Year End Florida Census Drive - 9/9

Nice job Jupiter, Melbourne, Vero, Tampa and Largo! All 80% or higher. Ft. Lauderdale almost there. We've got to progress each month.

Brad Carter
Director of Operations | Carter Healthcare
3105 S. Meridian Ave | Oklahoma City, OK 73119
O: 405-947-7700

---

From: Brad Carter
Sent: Tuesday, November 17, 2015 3:54 PM
To: Katherine Rogers; Fort Lauderdale; Boca Raton; Boynton Beach; Jupiter; Jensen Beach; Port St. Lucie; Vero Beach; Melbourne; Tampa; Largo; New Port Richey
Cc: Christine Creech; Preya Bhavsar; Brian Johnson
Subject: RE: Year End Census Drive

We are almost there Florida. Our statewide goal at the beginning of 2015 was to have 957 by years end and we are at 901. (I know the sheet says 973, that was because Vero Beach achieved their year end goal so quickly and graciously increased their year end...which they've already achieved AGAIN!) Now with a month and a half left we are 56 short of our goal. That's 5 per location increase between now and year end for 12 locations. We can do this. We will be the only state that will achieve their full statewide goals. There are 29 workdays left in the year (taking the holidays out), that's almost exactly 2 per day; there is no reason we can't do this. Good luck!!!

Brad Carter
Director of Operations | Carter Healthcare
3105 S. Meridian Ave | Oklahoma City, OK 73119
O: 405-947-7700

From: Brad Carter
Sent: Friday, December 18, 2015 9:14 AM
To: Katherine Rogers; Boynton Beach; Jensen Beach; Fort Lauderdale; Boca Raton; Jupiter; Vero Beach; Port St. Lucie; Melbourne; New Port Richey; Tampa; Largo
Cc: Brian Johnson; Christine Creech
Subject: RE: Year End Census Drive

Good morning. We are currently 29 patients away from achieving our year end goal. With two weeks left that's an increase of 15 per week. That's a little more than 1 per location! We can do this.

Brad Carter
Director of Operations | Carter Healthcare
3105 S. Meridian Ave | Oklahoma City, OK 73119
O: 405-947-7700

---

From: Katherine Rogers
Sent: Tuesday, December 22, 2015 8:38 AM
To: Boca Raton; Boynton Beach; Jensen Beach; Fort Lauderdale; Jupiter; Vero Beach; Port St. Lucie; Melbourne; New Port Richey; Tampa; Largo
Subject: Year End Census Drive


The Race to 957


Current MC


YE Goal


Needed

---

From: Brad Carter
Sent: Monday, December 21, 2015 2:22 PM
To: Katherine Rogers; Boynton Beach; Jensen Beach; Fort Lauderdale; Boca Raton; Jupiter; Vero Beach; Port St. Lucie; Melbourne; New Port Richey; Tampa; Largo
Subject: RE: Year End Census Drive

We are 25 away from our year end goal. We can do this. Its 2 per location!

Brad Carter
Director of Operations | Carter Healthcare
3105 S. Meridian Ave | Oklahoma City, OK 73119
O: 405-947-7700

From: Preya Bhavsar
Sent: Wednesday, December 23, 2015 7:53 AM
To: Katherine Rogers
Cc: Charlotte Nelson; Brad Carter; Lisa Donofrio; Kristen Dechert; Boca Raton;
Boynton Beach; Jensen Beach; Fort Lauderdale; Jupiter; Vero Beach; Port St.
Lucie; Melbourne; New Port Richey; Tampa; Largo
Subject: Re: Year End Census Drive

Keep it going everyone! Florida CAN and WILL hit their goals!

Preya Bhavsar
Associate Director of Operations
Carter Healthcare

206.   In some cases, Brad Carter even congratulated staff who convinced patients to stay on

service when they had sought to be discharged.  For example, comments include:

a.   "I saved 2 DC today to recerts :)"

b.   "I saved a discharge and turned it into a Recert today!!"

c.   "Way to go Kristen and Lisa on the Recert saves."

From: Brad Carter
Sent: Tuesday, December 22, 2015 8:27 PM
To: Lisa Donofrio
Cc: Kristen Dechert; Katherine Rogers; Boca Raton; Boynton Beach; Jensen
Beach; Fort Lauderdale; Jupiter; Vero Beach; Port St. Lucie; Melbourne; New Port
Richey; Tampa; Largo
Subject: Re: Year End Census Drive

Great job Lisa!!!

Sent from my iPhone

On Dec 22, 2015, at 7:17 PM, Lisa Donofrio
<ldonofrio@carterhealthcare.com<https://chmail.carterhealthcare.com/owa/redir.aspx
REF=xf-
XvKPLXZwvgDviuYczGwX0Nu86SUs9zkEr2YEJfXlY4fX5rk7TCAFtYWlsdG86bGRvb
wrote:

I saved 2 DC today to recerts :)

_____
From: Kristen Dechert
Sent: Tuesday, December 22, 2015 11:38 AM
To: Brad Carter; Katherine Rogers; Boca Raton; Boynton Beach; Jensen Beach;
Fort Lauderdale; Jupiter; Vero Beach; Port St. Lucie; Melbourne; New Port Richey;
Tampa; Largo
Subject: RE: Year End Census Drive

Woooo! Florida is rocking it! Keep it up team! I saved a discharge and turned it
into a Recert today!! Let's keep momentum!


-Kristen Dechert, RN

From: Sheril Geldmaker
Sent: Wednesday, December 23, 2015 7:32 AM
To: Preya Bhavsar; Katherine Rogers; Brad Carter
Cc: Charlotte Nelson; Lisa Donofrio; Kristen Dechert; Boca Raton; Boynton
Beach; Jensen Beach; Fort Lauderdale; Jupiter; Vero Beach; Port St. Lucie;
Melbourne; New Port Richey; Tampa; Largo
Subject: RE: Year End Census Drive

I am soooo proud of the JB/Jupiter and PSL Team, way to go Kristen and Lisa on
the Recert saves and to our PSCs who are all working very hard to help us hit this
goal!

Go Team Florida, all offices are working so hard, we got this!!!!

Sheril Geldmaker, RN
Clinical Coordinator | Carter Healthcare
1401 S.E Goldtree DR, Suite 101 | Port St. Lucie, FL 34952
O: 772-337-3600 | F: 772-337-4662

---

From: Brad Carter
Sent: Monday, January 04, 2016 3:05 PM
To: Tampa; Largo; New Port Richey; Fort Lauderdale; Boca Raton; Boynton
Beach; Jupiter; Jensen Beach; Port St. Lucie; Vero Beach; Melbourne
Cc: Brian Johnson; Christine Creech; Preya Bhavsar; Katherine Rogers
Subject: Year End Census Drive

Below is our final numbers for the year end census drive to 957. We ended the
year with 929, or 28 below our goal. We achieved 95% of our goal number and for
that I'm proud. Usually finishing at less than what the goal was is simply not
acceptable to me. However, considering we had a total increase of 139 for 2015
and we started this drive in August when we were -89, that is a huge step in the
right direction. I wanted to issue the final "Race to 957" numbers with some
additional year measures. The 139 increase on our census for the year represents
18% census growth for 2015. Our goals for 2016 are to have a total of 1145 MC,
an increase of 216 or 8%. This is completely within our reach. Let's start the year
off right and get ahead of the game.

207.    In addition to praising the offices for increasing their census, Carter Healthcare

rewards offices that meet the year-end certification goals by providing employees with additional

PTO.

From: Brad Carter
Sent: Monday, December 21, 2015 3:21 PM
To: Director of Operations; Clinical Coordinators
Cc: Darla Smith
Subject: FW: Final numbers

Here are your Year End Contest Winners!!!

Group 1 Jupiter
Group 2 Boca Raton
Group 3 McAlester (beating Conroe and New Port Richey by 1)
Group 4 San Angelo
Group 5 Melbourne
Group 6 Houston
Group 7 Largo

These Winners will get 3 days of PTO placed on their PTO bank on the next pay
period. Congratulations to all and a very good contest.

Brad Carter
Director of Operations | Carter Healthcare
3105 S. Meridian Ave | Oklahoma City, OK 73119
O: 405-947-7700

## XI.    Defendants Refuse to Discharge Patients

208.    In most home health care and therapeutic settings, a therapist or other licensed
medical professional makes a determination of medical necessity and recommends whether a
patient should be discharge.

209.    Patients normally have a say in the continuation or discontinuation of their care.

210.    Carter Healthcare requires that all discharges be approved by management.

211.    On multiple occasions, both Mahaffey and Brimer, licensed therapists, informed
management that particular patients needed to be discharged because they could no longer
benefit from therapy services.

212.    Management, which does not include qualified medical professionals, overrules
therapists in an effort to keep patients on service for longer than necessary periods of time.

213.    In a February 10, 2016 email, Brimer stated Carter Healthcare policy as being "no patient is to be [discharged] until it is approved by management. I understand corporate intent is to have them on service for a minimum of 6 months." No one in management disputed this policy.

214.    Requiring that management approve every discharge is not the normal business practice for home healthcare as it is the licensed therapists who are better positioned to determine the necessity of continued treatment.

215.    Carter Healthcare continues see patients even when they adamantly refuse care.

216.    When therapists protest the retention of a patient, Carter Healthcare moves that patient to another therapist's case load.

217.    When transferring the patients, Carter Healthcare leads the protesting therapist to believe the patient is being discharged.

218.    When transferring patients, Carter Healthcare misleads the patients as to why they are being transferred to another therapist.

219.    Carter Healthcare submits the transfer information to CMS and lies about the reasons for the transfer.

220.    For example, Mahaffey was preparing to discharge Patient A.A., who was no longer benefiting from occupational therapy services.

221.    Unbeknownst to Mahaffey at the time, a nurse visited Patient A.A. and recertified her for additional occupational therapy.

222.    When Mahaffey contacted Patient A.A. to set up discharge visit, Patient A.A. informed Mahaffey of the recertification.

223.   Mahaffey then contacted Scroggins, Rehabilitation Manager, to inquire about the recertification for Patient A.A.

224.   Scroggins informed Mahaffey that Nelson had recertified Patient A.A. and requested a new contract occupational therapist.

225.   Nelson claimed Patient A.A.'s doctor had requested a new occupational therapist.

226.   When Mahaffey arrived at Patient A.A.'s home for her final visit, Patient A.A. asked Mahaffey why she was receiving a new occupational therapist.

227.   Mahaffey told Patient A.A. that her doctor had requested a new occupational therapist.

228.   Patient A.A. called her doctor, in front of Mahaffey, and inquired as to why more occupational therapy had been ordered and why he had requested a new occupational therapist.

229.   Patient A.A.'s doctor denied having requested more occupational therapy or having ever requested a new occupational therapist.

230.   After being discharged from Mahaffey's care, Patient A.A. received one or two occupational therapy sessions with a new occupational therapist who confirmed that occupational therapy was unnecessary.

231.   Carter Healthcare billed CMS for these medically unnecessary therapy services.

232.   In order to retain Patient A.A. for the entire certification period, Nelson and Bhavsar, recognizing that two occupational therapists had determined Patient A.A. could no longer benefit from occupational therapy services, ordered Brimer to provide physical therapy sessions to Patient A.A.

233.   Brimer performed the requested physical therapy from January to February 2016.

234.    In his final report, Brimer wrote about how wonderfully Patient A.A. had responded to treatment and suggested she be discharged.

235.    Brimer documented that there is no medical reason for continued physical therapy.

236.    At a case conference meeting in March 2016, Brimer learned that Carter Healthcare recertified Patient A.A. again and, over his objections, assigned her to the newly hired occupational therapist.

237.    However, Patient A.A. renewed her objections to home care therapy services and has since been discharged from Carter Healthcare's service.

238.    When transferring a patient from one therapist to another, Carter Healthcare does not always pass on the patients records from the previous therapist or the previous certification period to the new therapist.

239.    Carter Healthcare enacted this policy so that new therapists will not be aware that the patient had previously been recommended for discharge.

240.    For example, when Brimer was assigned Patient E.G., he received no indication that Patient E.G. had previously received therapy.

241.    Upon visiting Patient E.G. for the first time, Brimer learned that Patient E.G. had been receiving therapy for approximately two months.

242.    Brimer learned this by looking at Patient E.G.'s Start Healthcare Folder and speaking with the patient's spouse. The Start Healthcare Folder is used by all disciplines in home healthcare to track a patient's pulse ox symmetry, respiration, blood pressure, and temperature; as well as maintaining a list of active medications.

243.    If not for Brimer performing his own investigation of Patient E.G., he would never have known the extent to which Patient E.G. received therapy.

244.    As part of Carter Healthcare's strategy to retain patients on their eservice for high census numbers, Carter healthcare rotates therapists between regions to ensure that one therapist does not service a single patient for too long a period.

245.    As part of Carter Healthcare's strategy to retain patients on their service and maintain high census numbers, Carter Healthcare assigns patients to new hires after their existing therapists have declared they will no longer treat a patients due to lack of medical necessity.

## XII.    Mahaffey Discloses Concerns to Management

246.    At a June 2015 staff meeting, Mahaffey disclosed her concerns to Management regarding Carter Healthcare's Policies on the recertification of patients.

247.    Mahaffey also expressed concerns about how the company predetermined the number of visits a patient should receive.

248.    Brimer confirmed that the 18 visit policy was instilled in therapists and management upon their initial hiring and during orientation at the company's headquarters in Oklahoma.

249.    In early February 2016, Mahaffey attended a case certification meeting to review patient cases.

250.    During this meeting, Mahaffey raised the issue of Carter Healthcare's policies regarding the recertification of patients.

251.    The meeting culminated with Mahaffey, supported by the other therapists in attendance, challenging Carter Healthcare's policy of pre-scheduling all patients for 18 therapy sessions, regardless of medical necessity.

252.  The very next day, Carter Healthcare terminated Mahaffey.

253.  After her termination, Mahaffey received a text from her co-worker asking "did

they try to make you [recertify a patient] and you refused?"




254.  Another co-worker wrote to Mahaffey, "I see – we've all been scared not to

[recertify patients]-now I see why […] now I know what happens if [you] refuse to [recertify

patients]."




## COUNT I
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

255.     Relators Mahaffey and Brimer incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

256.     The False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1)(A).

257.     Defendants knowingly presented or caused to be presented claims to obtain payment for medically unnecessary services in at least four ways:

      a.   First, Defendants mandate 18 visits per patient per certification period in order to maximize profit and remain undetected by CMS audit authorities.  These pre-scheduled treatments are done without regard to medical necessity and over the

objections of therapists in cases where patients are no longer benefiting from treatment.

b.  Second, Defendants overrule the recommendations of medical professionals when they force therapists to recertify patients for an additional 60 days of treatment when those patients receive no medical benefit from the additional treatment.  In addition, Defendants reward those therapists who recertify patients by providing them with cash bonuses and additional vacation days.

c.  Third, Defendants have a policy of keeping patients on service for at least six months, regardless of medical necessity.  When a therapist wants to discharge a patient, management imposes significant hurdles on the therapist, often refusing to discharge the patient altogether.  In other cases, management will tell the assigned therapist that the patient is being discharged and then surreptitiously transfer the patient to another therapist's service.

d.  Fourth, Defendants provide home health services to patients that are not, per CMS's requirements, homebound and are therefore ineligible for home therapy.

258.  The aforementioned conduct has led and continues to lead the Government – through Medicare and TriCare - to pay for medically unnecessary services, for which Defendant received payments of millions of dollars from the federal Medicare program and numerous state Medicaid programs.

259.  The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT II
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

260.   Relators Mahaffey and Brimer incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

261.   The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(B).

262.   Defendants knowingly made or caused to be made a false record or statement to a false claim when it created false narratives in the patient notes and OASIS reports so that it could recertify those patients and provide services in excess of what is medically necessary.

263.   The result of Defendants' actions has led the Government to pay for medically unnecessary services, for which Defendants received payments of millions of dollars from the Medicare and Medicaid programs.

264.   The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT III
### Violations of the Florida False Claims Act, Fla. Stat. § 68.082(2)(a)

265.   Relators Mahaffey and Brimer incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

266.   The Florida False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.  Fla. Stat. § 68.082(2)(a).

Defendants violated the Florida FCA in at least four ways:

a. First, Defendants mandate 18 visits per patient per certification period in order to maximize profit. These pre-scheduled treatments are done without regard to medical necessity and over the objections of therapists in cases where patients are no longer benefiting from treatment.

b. Second, Defendants overrule the recommendations of medical professionals when they force therapists to recertify patients for an additional 60 days of treatment when those patients receive no medical benefit from the additional treatment. In addition, Defendants reward those therapists who recertify patients by providing them with cash bonuses and additional vacation days.

c. Third, Defendants have a policy of keeping patients on service for at least six months, regardless of medical necessity. When a therapist wants to discharge a patient, management imposes significant hurdles on the therapist, often refusing to discharge the patient altogether. In other cases, management will tell the assigned therapist that the patient is being discharged and then surreptitiously transfer the patient to another therapist's service.

d. Fourth, Defendants have a policy of falsely certifying patients that are ineligible for homebound services to receive home healthcare services.

267.    The result of Defendants' actions has led the state of Florida to pay for medically unnecessary devices and supplies, for which Defendants received payments from Medicaid.

268.     The State of Florida has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT IV
### Violations of the Florida False Claims Act, Fla. Stat. § 68.082(2)(b)

269.     Relators Mahaffey and Brimer incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

270.     The Florida False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.  Fla. Stat. § 68.082(2)(b).

271.     Defendants knowingly made or caused to be made a false record or statement to a false claim when it created false narratives in the patient notes and OASIS reports so that it could recertify those patients and provide services in excess of what is medically necessary.

272.     Defendants knowingly made or caused to be made a false record or statement to a false claim when they illegally instructed their employees to recertify patients without regard to medical necessity.

273.     The result of Defendants' actions has led the Government to pay for medically unnecessary devices and supplies, which Defendants received payments from Medicaid.

274.     The State of Florida has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT IV
### Retaliation against Mahaffey in Violation of the False Claims Act, 31 U.S.C. § 3730(h)

275.     Relators Mahaffey incorporates herein by reference and re-alleges the allegations stated in the foregoing paragraphs.

276.     Mahaffey is an "employee" and Defendant Carter Healthcare is an "employer" as the terms are defined by the False Claims Act.

277.     Defendants terminated Mahaffey because she voluntarily performed lawful acts to investigate one or more violations of the False Claims Act, including questioning Defendants' recertification and billing practices.

278.     Mahaffey engaged in protected activity when she: (i) refused to recertify patients S.J and G.F.; (ii) when she emailed Nelson, Bhavsar, and Pepper detailing how it was medically unnecessary, unethical, and illegal to recertify patient; (iii) when she protested Defendants' policy of auto-scheduling 18 patient visits.

279.     Defendants, knowing that Mahaffey was engaging in such activity, terminated her because of her protected conduct.

280.     Temporal proximity between Mahaffey's disclosures, the most recent of which occurred only one day prior to her termination, and management's decision to end her employment is strongly suggestive of causation.

281.     To redress harms she suffered as a result of the acts and conduct of defendants in violation of 31 U.S.C. § 3730(h), Mahaffey is entitled to damages including two times the amount of back pay, interest on back pay, and compensation for any special damages, including emotional distress and any other damages available by law including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Relators Mahaffey and Brimer, acting on behalf of and in the name of the United States of America, and on their own behalf, pray that judgment will be entered against Defendants for violations of the Federal False Claims Act, 31 U.S.C. § 3729 et seq. and the Florida False Claims Act, Fla. Stat. § 68.081 et seq. and Retaliation against Relator Mahaffey in Violation of the False Claims Act, 31 U.S.C. § 3730(h) as follows:

a) That for violations of the False Claims Act, 31 U.S.C. §3729, *et seq.*, this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of $11,000 for each act in violation of 31 U.S.C. §3729;

b) That for violations of the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*, this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of the Defendants' actions, plus a civil penalty of $11,000 for each act in violation of Fla. Stat. § 68.081, *et seq*;

c) That Relators Mahaffey and Brimer be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d),  including the costs and expenses of this action and reasonable attorneys' fees;

d) In favor of Relator Mahaffey for all compensatory and punitive damages, including personal injury damages for pain and suffering and loss of reputation, back pay, interest, and attorneys' fees and costs to which she is entitled pursuant to 31 U.S.C. § 3730(h).

e) That the United States Government and Relators Mahaffey and Brimer receive all other relief, both in law and equity, to which they are reasonably entitled.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators Mahaffey and

Brimer hereby demand a jury trial.

March 23, 2016                                Respectfully Submitted,

_____

R. Scott Oswald, Esq. (Bar no. 158437)
David Scher, Esq. (to be admitted *pro hac vice*)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com

Attorneys for *Qui Tam* Plaintiffs